[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
Introduction
 A.
In 1987, Governor William A. O'Neill established the Blue Ribbon Commission on Housing to address the shortage of affordable housing in Connecticut. In the first report in 1988, the Commission submitted twenty-six recommendations, several of which were enacted into legislation. One year later the CT Page 3112 1989 report[1] was issued containing twenty-five proposals, including recommendation three "Affordable Housing Appeals Procedure". In response thereto, the legislature enactedP.A. 89-311 (now codified as General Statutes 8-30g and hereinafter referred to as the "Act"), a bill modifying judicial review of land development applications which include a certain percentage of affordable housing. The present appeal brought by the plaintiff developer, TCR New Canaan, Inc. (hereinafter, TCR), against the defendant, Planning Zoning Commission of the Town of Trumbull (hereinafter, the Commission), concerns such a land use application.
While many of the provisions of the Act will be discussed in this opinion,[2] it is important to note the definition of an affordable housing development at the outset. It is defined in subsection 8-30g(a)(1) as follows:
 "Affordable housing development" means a proposed housing development (A) which is assisted housing or (B) in which not less than twenty per cent of the dwelling units will be conveyed by deeds containing covenants on restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income, for at least twenty years after the initial occupation of the proposed development.
The Act does not apply in all situations. Subsection (f) provides exemption from these appeal provisions for those municipalities which have at least ten percent of all dwelling units meeting affordable housing requirements. Subsection (g) provides further exemption to municipalities which have received certification from the Commissioner of housing that a project has been completed which creates affordable dwelling units equal to at least one percent of all dwelling units in the municipality, and the municipality is involved in the Connecticut housing partnership program[3] or in the regional fair housing compact pilot program.[4]
 B.
The plaintiff is a Texas corporation with a place of business in New Canaan, Connecticut. Over the last ten years, its parent corporation has built approximately 220 apartment developments throughout the United States, and through one of its subsidiaries, manages approximately 80,000 units (Return Item 10a(3)). According to the record, the parent firm's total assets CT Page 3113 were valued at approximately $15 billion dollars in June 1989. The plaintiff has, since 1987, completed a total of 1200 apartment units in Middletown, Manchester, and Stamford, has a number of units under construction and has received municipal approvals for 1400 units in Hamden (Return Item 10a(4); plaintiff's complaint).
The plaintiff has an option to purchase the subject property, a 37-acre parcel[5] of land in Trumbull just above the northwest portion of the City of Bridgeport. The property is bounded by Rocky Hill Road on the northwest, Route 25 on the east, Wilson Avenue on the south and Old Town Road on the west. While the property is now zoned industrial, it is surrounded by a number of single family homes to the south and southwest and the City of Bridgeport's Fairchild Memorial Park to the south. (Return Item 10, p. 6).
The record reflects that the subject property has not always been zoned industrial. The 1963 Plan of Development recommended that the land be used for residential purposes, and the 1973 Plan of Development maintained the residential use (Appendix to Defendant's Brief, Exhibit II, p. 42).[6] Indeed the Plan states, in part, "[t]his area is not well-suited for industrial park development." Thus, the land was zoned residential. (Defendant's Brief, p. 1).
In 1978, the former owners, Messrs. Claydon and Moffitt, applied for a zone change to IL (industrial) zone (Return Items 13w-13dd). The Commission approved the request on July 26, 1978. The 1984 Plan of Development acknowledged this zone change. (Return Item 10f, pp. 32-33). It should be noted that the instant application actually affects two parcels, the 37-acre piece discussed above and a parcel located on the easterly side of Route 25. That land, also known as the Scinto parcel, is recognized in the 1984 Plan of Development as industrial. (Return Items 10, p. 6; 10f, p. 32). A request to change the Scinto parcel to commercial B-C to develop a retail shopping center was denied by the Commission. (Return Item 10, p. 6; Defendant's Brief, p. 17). In 1987, the subject parcel received subdivision approval for an office park. (Return Items 13a-13dd). An appeal of the decision was taken by the City of Bridgeport but dismissed by Judge H. Dean on January 4, 1990. (Defendant's Brief, p. 3; Appendix to Defendant's Brief, Exhibit 1).
 C.
The present application was filed on October 4, 1990. It is really a three-fold request: the first part involves an amendment to the zoning regulations to create an affordable CT Page 3114 housing development zone; the second part involves an amendment to the site plan regulations; and the third part involves the actual rezoning of the property to an affordable housing development (AHD) zone. (Return Item 2). It should be noted that, as proposed by the plaintiff, the AHD zone is in the form of an overlay zone applicable only to industrial zoned land of parcels greater than 30 but less than 40 acres. (Return Item 2, p. 4). The proposed zone, as a practical matter, only applies to the instant piece and the Scinto parcel across Route 25. The regulation is therefore site specific and would not affect other areas of town.
The proposed AHD regulation contains twenty separate sections. In addition to those common provisions concerning purpose and intent, use restrictions, and set back and bulk area requirements, certain sections require discussion. Section III defines an AHD utilizing the definitions in General Statutes8-30g(1) but with some minor variations. It states:
 An affordable housing development (AHD) shall be deemed to mean a housing development in which not less than 20% of the dwelling units will be held or conveyed by deeds containing convenants or restrictions which shall require that such dwelling units be sold and rented at, or below, prices which will preserve the units as affordable housing as defined in Section 8-39a of the Connecticut General Statutes for persons and families whose income is less than or equal to eighty percent of the area median income for at least twenty years after the initial occupation of the proposed development.
Section IV covers, inter alia, payments for the units whether by sale or by rental, the requirement that the construction will be of comparable quality to market rate units, that the units will be scattered throughout the project, that they will be built on a pro rata basis if the development is built in phases, that they are to be used as a primary residence with subletting at a higher rate prohibited, and that town (including Board of Education) employees will be given preference in the rental or sale of the affordable units.
Section VII includes requirements on coverage and mandates that fifty percent of the area be designated as open space. Subsection (d) states that the maximum dwelling units permitted is determined by multiplying the total number of acres by sixteen. This density limit is clearly controversial as the complex could contain at least 600 units under the proposal. The unit mix is regulated in Section IX to preclude units from containing more than three bedrooms, and to limit the two-bedroom CT Page 3115 units to twenty-five percent of the total units and one bedroom units to sixty-five percent of the total units.
 D.
At the public hearing on November 14, 1990, the applicant presented a number of witnesses and documents to prove compliance with the mandates of General Statutes 8-30g(a). For instance, from the State of Connecticut Department of Housing, a document was presented which indicated that Trumbull had in 1989 approximately 11,278 housing units, with only 200 qualifying under the Section 8-30g(a) "as assisted" housing definition.[7]
This means that Trumbull has only 1.8 percent of its housing deemed "affordable" and the town, therefore, does not fall within the ten percent exemption as set forth in General Statutes8-30g(f).
Charles Berman, a partner of Trammel Crow Residential (Return Item 10a (4)) discussed the operation of the plaintiff's project in Middletown. (Return Item 10a (5)). He discussed a typical floor plan of a rental unit, recreational amenities, the profile of possible tenants and the range of rental amounts. He also discussed the density proposal of 16 units per acre, noting that TCR's Middletown project ranged from 15-25 units per acre, that its Manchester project ranged from 22-25 units per acre and that the national standard is 35 to 40 units per acre. (Return Item 10, pp. 12-19). TCR representative Andrew Miller further commented on site development. (Return Item 10, p. 20). Lawrence Kenney, vice president of Scott, Fitton Company, a real estate research and consulting firm (Return Item 10a (6)), discussed Trumbull's housing market and housing affordability. He noted that in the past ten years, the average priced home rose from $100,000.00 to $241,000.00. Utilizing the general criteria of 30% of gross income to cover mortgage, taxes and insurance, and assuming 20% down payment, a household income would require a minimum annual income of $76,000.00 to purchase the average home. He stated that of the 122,000 households in the seven-town region,[8] approximately 100,000 would not be able to afford this home. (Return Item 10, pp. 19-22).
Mr. Kenney then noted that a moderate income household would be one that earns less than $38,400 per year (Return Items 10, p. 22; 10c). This family would only be able to purchase a home for $117,000 and according to his research, only two homes in the one year period before the hearing sold for under $123,000.00. He further indicated that only 6% of all housing in Trumbull was rental compared to 35% in the state and that to afford a typical rental of $1185.00 per month,[9] a household income of $55,000 a year would be required. (Return Item 10, p. 22). Finally, he observed that using the maximum rent allowed CT Page 3116 under state law for an affordable unit of $960 per month, 3100 households or about one-third of all Trumbull households would qualify for the affordable units. (Return Item 10, p. 22).
The next witness was Professor David Listokin, from the Center for Urban Policy at Rutgers University. (Return Item 10a (6)). He discussed the impact of such a proposed development on the local school system and concluded, from national and Connecticut studies, that the school age yield of approximately .05 students per unit of attached housing would equate to 50 to 75 students from the proposed project. (Return Item 10, p. 23-27; 10a(9)).
The applicant's last witness was Alan Mess, a traffic engineer who discussed the traffic impact from a 600-unit residential complex on the site. He compared the proposed use to the approved office park use and found that the office park was estimated to generate 4120 trips per day while the proposed residential use would generate 3660 trips. In terms of peak rush hours, the office park would generate 800 morning trips and 770 afternoon trips, while the residential use would generate 320 morning and 405 afternoon trips. (Return Items 10, pp. 28-30; 10a (10)). He also stated that:
 A land use such as industrial with its truck traffic, or office with its peaking effect of rush hour traffic, is not as compatible with a neighborhood that's currently residential and the allowable use being residential. . . . Specific access to the site would be off, according to the local road, that's Old Town Rd. That road has a number of sharp curves in it and has some grades to it, in fact there's a hill directly in front of the site. The site selection of where that driveway occurs can be made such that it would be a safe, efficient access point. That is not necessarily where the concept plan shows it, but there is, from our understanding of where the frontage is and our investigations in the field, we believe the site has sufficient access. . . . We do believe that there may be some necessary improvements to the roadway system. That may be some widening through that area where the access point is or some changes to the nearby intersections. This is typically done when an application is either made to a Town, or in this particular case because of its size and its location, and application must be made to the State Traffic Commission [sic]. Return Item 10, p. 29).
The Commission also received letters from two regional planning agencies. The Greater Bridgeport Regional Planning CT Page 3117 Agency, in a letter dated October 25, 1990, supported the establishment of an affordable housing development with, inter alia, a density of 10 units per acre. (Return Items 3; 7). The Valley Regional Planning Agency also supported the concept with certain set back modifications. (Return Items 4; 9).
After questions from the Commission, sixteen members of the public spoke in opposition to the application. The comments ranged from concerns about density to concerns over growth in school population. Commission and staff members then closed the hearing with further questions. One question of interest was asked by the town engineer, Mr. Finkheimer, concerning the possibility that many of the units would fall into the affordable price range, thus increasing the designated 20% number to something much higher. The plaintiff, through Mr. Berman, concurred, adding that "[i]t is highly likely a significant percentage, if not all, of the units would end up qualifying as affordable" but "the lending world has said they will not lend on projects that have more than that" (20%). (Return Item 10, p. 81). Both applicant and Commission representatives then agreed that unless the units were deed-restricted (Return Item 10, p. 81-82),[10] they would not qualify under the statute as affordable. The hearing was closed that night and the Commission met on December 13, 1990 and again on December 19, 1990 at which time it voted to deny the applications. A letter was sent to the plaintiff on January 2, 1991 (Return Item 16) advising of the denial with 19 stated reasons. The Commission had its denial published in The Bridgeport Post on January 3, 1991 and the present appeal was issued and served on January 16, 1991.
 II.
Discussion
 A.
1.
At the outset, this court must comment on the applicability of the AHD statute to applications for legislative action (i.e., zone changes) as opposed to applications for administrative action (i.e., site plans, special exception, etc.). This issue was raised by the Commission in its motion to dismiss dated February 14, 1991 and argued to Koletsky, J. on March 11, 1991. He denied the motion, without prejudice, in bench ruling allowing the parties to argue it again at trial.
Briefly stated, the Commission's argument is that TCR's applications for the creation and actual rezoning of the subject parcel for an affordable housing development and CT Page 3118 subsequent site plan review do not fall within the purview of the Act because the application is not one for actual development. The Commission argues that only administrative actions, i.e., review of specific special permits or site plans, are within the parameters of this novel review process and not legislative zone change applications.
At the hearing, this court denied the motion to dismiss and reemphasizes its reasons herein.
2.
Plaintiff argues that the motion to dismiss is inappropriate because whether or not the provisions of Section 8-30g apply, this court has jurisdiction to hear this matter because it is still a zoning appeal. This court is in agreement. The Act states at Section (b) "[e]xcept as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of Section 8-8. . . ." It makes certain changes including venue, burden of proof and standard of review, but it does not delete these appeals from the zoning family. Whether the provisions of P.A. 89-311 apply to this appeal is a different question from whether this court has jurisdiction to hear this case.
In a similar situation, in Creative Development for Colchester, Inc. v. Colchester Zoning and Planning Commission,5 Conn. L. Rptr. 95, 96 (1991), Judge M. Hennessey stated that: "the affordable housing statute . . ., does not affect the court's authority to hear appeals brought thereunder, but merely modifies certain procedures and standards of review." The court therein added "thus, even if a case is found not to be governed by the affordable housing statute, the court would nevertheless have jurisdiction over the subject matter. . . ." Judge T. Corrigan in Kraft v. Madison Planning Zoning Commission, 4 Conn. L. Rptr. No. 20, 662 (Sept. 30, 1991) also denied a similar motion to dismiss. He stated "[t]o permit a town to avoid zoning for such development and at the same time require an applicant to petition for a zone change before making an application would thwart the purposes of the legislation." The Commission's motion to dismiss confuses subject matter jurisdiction with the applicability of the provisions of the Act. This court believes it not only has jurisdiction, but that the provisions of Section 8-30g apply.[11]
3.
"To discern the intent of the legislature, we look first to the words of the statute." In re Sheldon G., 216 Conn. 563, CT Page 3119 568, 583 A.2d 112 (1990) citing State v. Kozlowski, 199 Conn. 667,673, 509 A.2d 20 (1986). The two important definitions in Section 8-30g(a) are:
 (1) "Affordable housing development" means a proposed housing development (A) which is assisted housing or (B) in which not less than twenty per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income, for at least twenty years after the initial occupation of the proposed development; and
 (2) "affordable housing application" means any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing.
The legislature has defined an affordable housing application as "any application" in connection with an affordable housing development. The legislature could have limited the definition to apply only to an application for a site plan, a special permit or special exception or a subdivision plan in connection with an affordable housing development. It did not. The use of the word "any" indicates to this court, that the intent was to apply to every type of application.
"The words of a statute are to be given their commonly approved meaning unless a contrary intent is clearly expressed," Pintavalle v. Valkanos, 216 Conn. 412, 416, 581 A.2d 1050 (1990) quoting Kilpatrick v. Board of Education, 206 Conn. 25, 28,535 A.2d 1311 (1988). Likewise, in the absence of ambiguity, statutory language should be given its plain and ordinary meaning. Jones v. Civil Service Commission, 175 Conn. 504, 509,400 A.2d 721 (1978). This court does not believe there is any ambiguity in the word "any." As "no word or phrase should be treated as superfluous", Wilcox Trucking, Inc. v. Mansour Builders, Inc., 20 Conn. App. 420, 424, 567 A.2d 1250, cert. denied 214 Conn. 804 (1990), this court holds that any application means just that — any zoning application whether legislative or administrative.
4.
In construing a statute, "our goal is to `ascertain and CT Page 3120 give effect to the apparent intent of the legislature.'" In re Sheldon G, supra, 568 quoting State v. Champagne, 206 Conn. 421,428, 538 A.2d 193 (1988). When the words of a statute are plain and unambiguous, we need look no further for interpretive guidance, because we assume that the words themselves express the intention of the legislature. . . . When we are confronted, however, with ambiguity in a statute, we seek to ascertain the actual intent by looking to . . . the legislative history and circumstances surrounding the enactment of the statute . . . and the purpose the statute is to serve." Norwich v. Housing Authority, 216 Conn. 112, 117-118, 579 A.2d 50 (1990) (other citations omitted). This court, as indicated, does not believe that "any" is ambiguous. The Blue Ribbon Commission report and the comments of certain legislators clearly show the intent and purpose of this Act. Some reference to them is certainly appropriate.
The Blue Ribbon Commission detailed the affordable housing shortage in Connecticut. As mentioned, the report contained an assessment by region, of the housing needs of the state. Overall, the state was deficient by 181,535 units and for the subject area, 22,163 units, or a deficiency percentage of 19.17% — the highest in the state. (BRC report, pp. 7-9). The co-chairmen of the Blue Ribbon Commission accentuated the magnitude of the problem in their transmittal letter with the report by concluding:
 Throughout the period of our deliberations, the housing crisis continued to threaten the welfare of our citizens and the economic prosperity of our business community. We believe that, if the recommendations made by the Commission are adopted, great progress can be made in producing new affordable housing, preserving existing affordable housing, preventing homelessness, and planning land use strategies that benefit all our citizens.
Several legislators commented or asked questions about the proposed legislation. Representative Cibes' comments are instructive on the purpose of the legislation. He states:
 Thank you, Mr. Speaker. This is an important amendment and an important bill and I want to rise — I hope to make it clear to the members how important this whole topic is. We have a, if not a crisis of affordable housing in this state, a very definite problem. We have areas of the state where kids of families living in those towns cannot buy housing, cannot afford a place to live CT Page 3121 in those towns.
 We have towns in this state where the municipal employees of those towns cannot afford housing within the boundaries of the town. We have, with respect to firefighters and police officers and teachers, basically cannot afford places to live in those towns. The infrastructure of this state is at a risk because in certain areas of the state the towns cannot find employees within a certain driving distance in order to work in the infrastructure, at the infrastructure.
 In fact, Mr. Speaker, and members of the General Assembly, we have areas of the state where business cannot find employees within driving distance of the job because there is not affordable housing in that area. A number of organizations have recognized this fact and have accordingly urged us to move forward with this bill, and after this amendment has been drafted, to move forward with amendment.
32 House Procs., Part 30, May 30, 1989, at 10597-10598. Likewise, Representative Rappaport states:
 The primary conclusion of the Blue Ribbon Commission was that the issue that we are grappling with now was the single largest obstacle to the building and creation of affordable housing in the State of Connecticut and that was the availability of affordable land and overcoming the resistance of communities who do not want to have affordable housing in those towns.
Id., at 10672-10673. Representative Rappaport adds:
 Mr. Speaker, let me just say that I think that if we're going to reject this amendment, and I hope and believe that we are not, but if we're going to reject this amendment or reject this bill, then we might as well say to ourselves so that we understand it, what our actions will say to the people of Connecticut who believe and want affordable housing and that is that when push comes to shove, it really doesn't matter to us that the sacred right of a community to decide exactly who and what kind of housing far overshadows in our view the demonstrated, amply demonstrated crisis and I do believe it's a crisis that we have in this state for affordable housing. . . .
CT Page 3122
Id., at 10675. Senator Sullivan stated:
 [A]nd an extraordinary bill in this respect I think can be accepted at a time when there is an extraordinary need to address the concern of affordable housing throughout the State.
32 Senate Procs. Part 3, June 5, 1989 at 4058.
While there is no direct discussion on the applicability of the proposed legislation to legislative acts, two legislators touched on the issue in their comments. First, Representative Cibes, in commenting on whether a conflict with an existing zone classification would be grounds for a denial under the Act stated:
 Through you, Mr. Speaker, the answer is no, not per se. The municipality might have very good grounds for not having multifamily dwellings in the particular area. The soil type, the capacity of the infrastructure, various reasons such as that might have been a reason for the municipality not to adopt a particular zone for that particular area, but per se, there would not — it would not be a reason for rejecting this application [sic].
32 House Procs., supra, at 10608-10609. This would appear to be a tacit recognition that an application would or could include a zone change proposal.
Senator Blumenthal's comments seem to support the Commission's argument that the Act does not apply to a zone change application. He states:
 And it is important to understand that these decisions involve specific projects on particular pieces of land and do not provide for any kind of general zoning override.
32 Senate Procs., supra, at 4048. The statement does not necessarily mean that the Act is only applicable to administrative applications. The present applications certainly apply to a "specific project." In North Haven v. Planning Zoning Commission, 220 Conn. 556 (1991), our Supreme Court examined zoning Section 8-3h, which requires notification to an adjoining municipality of "the pendency of any application, petition, request or plan concerning any project on any site" which will generate traffic in the neighboring town. The court held that the notice requirement did not apply to zoning applications of general applicability, but applied "only when the CT Page 3123 application . . . relates on its face to a specific project . . ." Id. 563. The court noted that a project is ordinarily proposed by a site specific or structure specific request. . . . Id. 566. The court did not address, and so noted, the issue of whether Section 8-3h applied to a request for a zone change for a specific site. Id. 566. The proposal herein is specific and not a floating zone that could apply on land anywhere in Trumbull. See Sheridan v. Planning Board, 159 Conn. 1, 16, 266 A.2d 396
(1969); Homart Development Co. v. Planning Zoning Commission,26 Conn. App. 212, 214, 600 A.2d 13 (1991).[12]
This court believes that the legislative history supports the premise that "any" application does apply to a zone change application.
5.
This court also rejects the Commission's argument that the word "application" cannot apply to zone changes as the words "petition" and "petitioner" are used in Section 8-3c, the section that applies to zone changes. As pointed out by the plaintiff, Chapter 124 uses the words "application" and "petition" interchangeably. See, for example, sections 8-7c, 8-8f, 8-26f and 8-28a. Decisions of our Supreme Court, Blaker v. Planning and Zoning Commission, 212 Conn. 471,562 A.2d 1093 (1989) (utilizing both names to describe zone change requests) and our Appellate Court, Coastal Suburban Builders, Inc. v. Planning Zoning Commission, 2 Conn. App. 489,479 A.2d 1239 (1989) ("application" for zone change used throughout discussion) make no such distinction.
Most recently in North Haven v. Planning Zoning Commission, supra, 567, the court discussed this very question, albeit, in a different context, noting that "petition" and "application" are used interchangeably.
6.
 a.
If this court were to adopt the Commission's view on the limited applicability of P.A. 89-311, this Act would have little, if any, purpose. As indicated, a review of the BRC report, and the testimony of its members as well as the statements of various legislators, clearly indicate the goal was to address the state's affordable housing shortage. For a discussion of this same issue in Massachusetts see generally, Board of Appeals of Hanover v. Housing Appeals Com., 294 N.E.2d 393 (Mass. 1973) (Legislature's adoption of an administrative mechanism designed to supercede, when necessary, local zoning laws in CT Page 3124 order to promote construction of low and moderate income housing held valid).
Connecticut zoning is premised on the notion of the "use" of land. Zoning regulates the use of land irrespective of who may be the owner of such land at any given time and is defined "as a general plan to control and direct the use and development of property in a municipality or a large part of it by dividing it into districts according to the present and potential use of the properties," Karp v. Zoning Board,156 Conn. 287, 297, 240 A.2d 845 (1968) citing State ex rel Spiros v. Payne, 131 Conn. 647, 652, 41 A.2d 908 (1945). Such control of land is known as Euclidian zoning based on the seminal case of Village of Euclid v. Ambler Realty Company, 272 U.S. 365 (1926). In Euclid the Supreme Court upheld a zoning classification scheme noting that if the legislative classification was fairly debatable, the legislative judgment must be allowed to control. Euclid, interestingly enough, concerned, in part, the exclusion of apartment houses in residential districts in a Cleveland suburb. Justice Sutherland was not overly kind in his description of this form of housing ("Very often the apartment house is a mere parasite constructed in order to take advantage of the open spaces and attractive surroundings created by the residential character of the district. Moreover, the coming of one apartment house is followed by others, interfering with the free circulation of air. . . ."). Id.
The Commission contends that applying the Act to a legislative determination would be invading that time honored principle, clearly evident in traditional zoning law, that courts defer to legislative decisions of local zoning agencies. Malafronte v. Planning Zoning Board, 155 Conn. 205, 208-210,230 A.2d 606 (1967). Indeed, as properly pointed out by the Commission, "the history of zoning legislation indicates a clear intent on the part of the General Assembly that, subject to certain underlying principles, the solution of zoning questions is for the local agencies." Couch v. Zoning Commission,141 Conn. 349, 359, 106 A.2d 173 (1952) citing Eden v. Town Plan Zoning Commission, 139 Conn. 59, 89 A.2d 746 (1954).
The often stated reason is that "[t]he circumstances and conditions in matters of zone changes and regulations are peculiarly within the knowledge of the zoning commission." Kutcher v. Town Planning Commission, 138 Conn. 705, 710,88 A.2d 538 (1952). Thus, "[c]ourts must not and legally cannot substitute their own discretion for that of the zoning agencies." Id. Recently our Appellate Court reiterated this proposition in Homart Development Co. v. Planning Zoning Commission, supra, 216, stating: CT Page 3125
 A local zoning authority acting within its legislative capacity is endowed with the freedom to act or not to act as it deems appropriate to meet the needs and demands of the body politic, as it determines those needs and demands. "Balancing the preservation of the status quo with the reasonable pressures for change due to the growth in population and the onslaught of business needs and community requirements is a function of zoning which must best be resolved by the duly authorized legislative municipal body. . . ." [citing] Jablon v. Town Planning Zoning Commission, 157 Conn. 434, 443, 254 A.2d 914
(1969).
This deference is, however, based on the presumption that Commission is not acting illegally, arbitrarily, or abusing its discretion. Coastal Surburban Builders, Inc. v. Planning Zoning Commission, 2 Conn. App. 489, 492,479 A.2d 1239 (1989).
While our zoning regulations shall be made in accordance with a "comprehensive plan", General Statutes 8-2,[13] the plan need not be anything other than the zoning regulations. Summ v. Zoning Commission, 150 Conn. 79, 88, 186 A.2d 160 (1962); Woodford v. Zoning Commission, 147 Conn. 30, 33, 156 A.2d 470
(1959). There need not be any actual "plan." Corsino v. Grover,148 Conn. 299, 313, 170 A.2d 267 (1961). Likewise, the plan of development mandated by General Statutes 8-23 is an advisory, rather than a regulative instrument. Levinsky v. Zoning Commission, 144 Conn. 117, 123, 127 A.2d 822 (1956), and, as such, is not binding in the zoning commission. Dooley v. Town Plan Zoning Commission, 154 Conn. 470, 473, 226 A.2d 509
(1967). Apparently, one result of this freedom is the lack of affordable housing now recognized by the BRC and the legislature.
 b.
The Blue Ribbon Commission was also aware of two very significant judicial decisions. The first was local, Builders Service Corporation, Inc. v. Planning and Zoning Commission,208 Conn. 267, 545 A.2d 530 (1988), in which the Connecticut Supreme Court held that minimum floor area requirements in a zoning regulation were invalid in the absence of any evidence demonstrating a rational relationship between the floor requirements and legitimate objectives of zoning. The court noted that the legislature's direction "to encourage the development of housing opportunities for all citizens of the municipalities" was mandatory and that this applied to all zones. Id. 305. The court found that floor regulations which made no reference to occupancy did not rationally relate to a proper objective of zoning and thereby raised "serious concerns that the CT Page 3126 only possible justification . . . is an intent to discriminate against those with moderate and lower incomes in that district. This form of denial of access to certain residential districts is unequivocally not a purpose authorized by 8-2." Id. 298.
On the federal level, but also close to home, the United States Court of Appeals rendered its decision in Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926
(2d Cir. 1988), aff'd 488 U.S. 15, reh. den. 488 U.S. 1023 (1988), finding that the town's refusal to rezone an area designated single family for a multifamily use was, under that fact situation, a violation of the Fair Housing Act. The court rejected all of the town's "reasons" for refusing to rezone, holding that the zoning policy of keeping all multifamily use in certain areas had a disparate impact on the minorities living in town.
Our Supreme Court has stated that "identifying the societal problems which the legislature sought to address may be particularly helpful in determining the true meaning of the statute." State v. Parmalee, 197 Conn. 158, 161, 496 A.2d 186
(1985). The Blue Ribbon Commission and the legislature drafted the new Act knowing the shortage of affordable housing in Connecticut. If the Act did not apply to zone changes, one could safely assume that the Act would have little effect in remedying the affordable housing shortage. Before one can get up to bat and file for site plan or special permit review, one needs to get into the park. The multifamily or increased density use must first be allowed and property rezoned. "Any" application has to include that first step. Otherwise, it will be business as usual and there will be no opportunity to address the problem. Courts must presume that legislatures do not intend to enact useless legislation. Bergner v. State, 144 Conn. 282, 287,130 A.2d 293 (1957).
 c.
This interpretation is also consistent with the legislature's recent actions. In 1984, the legislature amended General Statutes 8-2 by stating that zoning regulations should "encourage the development of housing opportunities for all citizens of the municipality, consistent with soil types, terrain and infrastructure capacity." In 1988, in P.A. 88-203, legislation was enacted to prohibit zoning regulations from excluding manufactured and mobile homes. Additionally, the legislature added Section 8-2g in 1988 (P.A. 88-338) to allow density bonuses by developer agreements.
In its most recent session, the legislature again amended Section 8-2 (zoning) and Section 8-23 (planning) in P.A. 91-392. CT Page 3127 The change was a modification to the language added in 1984, discussed above. The new legislation states, in part:
 Such regulations shall also encourage the development of housing opportunities, INCLUDING OPPORTUNITIES FOR MULTIFAMILY DWELLINGS, CONSISTENT WITH SOIL TYPES, TERRAIN AND INFRASTRUCTURE CAPACITY, for all RESIDENTS of the municipality AND THE PLANNING REGION IN WHICH THE MUNICIPALITY IS LOCATED. . . . SUCH REGULATIONS SHALL ALSO PROMOTE HOUSING CHOICE AND ECONOMIC DIVERSITY IN HOUSING, INCLUDING HOUSING FOR BOTH LOW AND MODERATE INCOME HOUSEHOLDS, AND SHALL ENCOURAGE THE DEVELOPMENT OF HOUSING WHICH WILL MEET THE HOUSING NEEDS IDENTIFIED IN THE HOUSING PLAN PREPARED PURSUANT TO SECTION 8-37t
AND IN THE HOUSING COMPONENT AND THE OTHER COMPONENTS OF THE STATE PLAN OF CONSERVATION AND DEVELOPMENT PREPARED PURSUANT TO SECTION 16a-26.
This court therefore finds for all of the above reasons, the phrase "any application" includes legislative as well as administrative applications.
 B.
Section 8-30g(b) begins with the statement that "[a]ny person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units . . . may appeal such decision pursuant to the procedures of this section." The section ends with "[e]xcept as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of said sections 8-8, 8-9, 8-28, 8-30 or8-30a, as applicable." The reference to Section 8-8 and the wording of the first sentence of 8-30g(b) clearly suggest to this court that even though the word "aggrieved" was not used by the legislature, Connecticut common law applies to these appeals — albeit, perhaps on a limited basis.[14]
Aggrievement has a two-fold test:
 First, the party claiming aggrievement must demonstrate a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must establish that this specific, CT Page 3128 personal and legal interest has been specially and injuriously affected by the decision. Walls v. Planning Zoning Commission, 176 Conn. 475, 477-78, 408 A.2d 252 (1979).
At the hearing, the plaintiff introduced, without objection, a redacted version of its option to purchase and certified copies of the five deeds which describe the property. AS contract purchasers have been found to be aggrieved, Fletcher v. Planning Zoning Commission, 158 Conn. 497,264 A.2d 566 (1969); Shulman v. Zoning Board of Appeals, 154 Conn. 426,431, 226 A.2d 380 (1967) and as the Commission denied this affordable housing application, this court found at trial, and reiterates herein, that the plaintiff has a specific and legal interest which has been injuriously affected by the Commission's decision and is therefore aggrieved. Walls v. Planning Zoning Commission, supra, 478.
 C.
1.
As previously discussed, a zoning commission acts in its legislative capacity when adopting new regulations or rezoning property. Burnham v. Planning Zoning Commission, 189 Conn. 261,265, 455 A.2d 339 (1983). Thus, "conclusions reached by the Commission must be upheld by the trial court if they are reasonably supported by the record." Id. Where a zoning authority has stated its reasons . . . the reviewing court ought only to determine whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations. First Hartford Realty Corporation v. Plan Zoning Commission, 165 Conn. 533, 543, 338 A.2d 490
(1973), citing De Maria v. Planning Zoning Commission,159 Conn. 534, 540, 271 A.2d 105 (1970). "The action of the commission should be sustained if even one of the stated reasons is sufficient to support it." Goldberg v. Zoning Commission,173 Conn. 23, 25, 376 A.2d 385 (1977). It is not our function to retry the case "and the question is not whether the trial court would have reached the same conclusion but whether the record before the agency supports the decision reached." Calandro v. Zoning Commission, 176 Conn. 439, 440, 408 A.2d 229 (1979).
While a commission is required to give its reasons when it changes a zone, General Statutes 8-3(c); Zenga v. Zebrowski,170 Conn. 55, 61, 364 A.2d 213 (1975), Section 8-3(c) does not require a commission to state its reasons when it denies a zone change. Calandro v. Zoning Commission, supra, 441. CT Page 3129
2.
The above rules are the traditional standards for judicial review of an administrative decision made in a legislative capacity. For decisions made in an administrative capacity (i.e., site plan, special permit, subdivision permit), the review focuses on whether the application conforms to the regulations. See, Housatonic Terminal Corporation v. Planning Zoning Board, 168 Conn. 304, 306, 362 A.2d 1375 (1975). Indeed, the traditional plaintiff has the burden of proving the commission acted illegally. Woodford v. Zoning Commission,147 Conn. 30, 32, 156 A.2d 470 (1959). Thus, in challenging the validity of a municipal ordinance (including a zoning ordinance), it is the duty of the court to sustain the ordinance unless invalidity is established beyond a reasonable doubt. Aaron v. Conservation Commission, 183 Conn. 532, 537,441 A.2d 30, 34 (1981) quoting Connecticut Theatrical Corporation v. New Britain, 147 Conn. 546, 553, 163 A.2d 548 (1960).
General Statutes 8-30g(c) changes the rules. This section states:
 (c) Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record complied before such commission that (1) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (2) the decision is necessary to protect substantial public interest in health, safety, or other matters which the commission may legally consider; (3) such public interests clearly outweigh the need for affordable housing; and (4) such public interests cannot be protected by reasonable changes to the affordable housing development. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, demand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it.
The legislature has now placed the burden of proof on the commission,[15] and not, as in traditional appeals, on the applicant.[16] Like a traditional appeal, however, the evidence is to be gleaned from the record; the new process is not a trial de novo. The commission is required to cite reasons for its decision and the reasons are to be supported by sufficient evidence.
It is worth noting that "sufficient evidence" is not CT Page 3130 a significant departure from our traditional burden of persuasion requirement. This new standard of sufficient evidence seems akin to the "reasonably supported standard" previously mentioned. Westport v. Norwalk, 167 Conn. 151, 161,355 A.2d 25 (1974). Moreover, this court notes that in discussing the "substantial evidence" requirement which governs inland-wetland appeals, Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 525, 539, 525 A.2d 940 (1987), and administrative procedure act appeals under General Statutes4-183(j)(5), the Supreme Court has compared it to the sufficiency of evidence standard. The court in Huck stated:
 This so-called substantial evidence rule is similar to the `sufficiency of the evidence' standard applied in judicial review of jury verdicts and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. `. . .' The "substantial evidence" rule is a compromise between opposing theories of broad or de novo review and restricted review or complete absention. It is broad enough and capable of sufficient flexibility in its application to enable the reviewing court to correct whatever ascertainment abuses may arise in administrative adjudication.
Id., 541 citing Lawrence v. Kozlowski, 171 Conn. 705, 708,372 A.2d 110, cert. denied, 431 U.S. 969 (1977). See also Tait and La Plante, Handbook of Connecticut Evidence 4.1; 4.3, 2nd Ed. 1988.
This court is mindful of statements by two legislators on the meaning of sufficient evidence. Representative Tulisano explained that sufficient evidence means that "there's enough evidence to reach a particular conclusion. It is in fact a new system we're developing here today." He added, "[I]t is not a very high standard whatsoever, and so I think the Representative is correct that it is just a matter of fact that something has to be there and they will have sustained their burden. It is in fact a very easy thing to do." 32 House Procs., Part 30, May 30, 1989 at 10579.
Likewise, Representative Cibes stated in response to certain questions on the meaning of sufficient evidence that "it lowers the level which must be satisfied — the intention is to lower the burden of proof for the community to lower the level CT Page 3131 of interest which is required," and, finally, "the intent here is to ratchet down the level of interest that is for the commission to demonstrate that it is correct." Id., at 10619-10621.
While the legislature may have given this standard a new label, this court believes the burden imposed by this requirement is no different than that required by the substantial evidence rule.
4.
The second mandate worth discussing is that which requires the Commission to cite reasons. While not any different from what is imposed in traditional zoning appeals, it takes on added significance under this statute. As indicated, statutory mandates to cite reasons have been construed as being directory. Nielsen v. Board of Appeals on Zoning, 129 Conn. 285, 287,27 A.2d 392 (1942). Thus, even though required by statute, courts do not void a decision where the commission has failed to cite reasons. Courts presented with disputes where no findings were made have had to search the record for reasons supporting the commission's actions, a search which they have termed a `burden'. Zieky v. Town Planning and Zoning Commission, 151 Conn. 265, 268,196 A.2d 758 (1963). "This court has many times declared that a zoning board of appeals should state reasons for its actions because the failure to state reasons casts on the court the burden of searching the record. . . ." Carini v. Zoning Board of Appeals, 164 Conn. 169, 171, 319 A.2d 390 (1972).
Yet, despite this burden, the Nielsen rule has been applied to all land use boards — not just zoning boards of appeals. See, for example, Parks v. Planning Zoning Commission, 178 Conn. 657, 661-662, 425 A.2d 100 (1979) and APW Holding Corp. v. Planning Zoning Board, 167 Conn. 182,186-87, 355 A.2d 91 (1974).
The Nielsen rule has not, however, been without controversy. In his treatise on Connecticut zoning, Connecticut Land Use Regulations, (1979), Professor Tondro advocated overruling Nielsen for three reasons:
 It is only by assuming that the statement-of-reasons requirement is a formality . . . devoid of substantive content . . . that the Nielson [sic] holding and the cases that in turn rely on it are sensible. But the statement-of-reason requirement is not simply another formality . . . . [T]he process of having to relate a decision . . . is . . . a technique for confining [the Commission's] discretion . . . . A second reason for CT Page 3132 overruling Nielson [sic] is that in practice it penalizes the commission that tries to be fair to the parties . . . . Finally, the Nielson [sic] rule significantly qualifies the meaning of the public hearing guaranteed a participant: Although the parties may have a right to be apprised of the facts on which the board will be asked to act, they are not entitled to know the actual basis for the board's action. Tondro, p. 196-200.
It should hardly be surprising that in his testimony to the legislature on this provision of Public Act 89-311, Professor Tondro commented:
 The substance of this bill is simple, I believe, and that's that the reasons given by a municipal land use agency be it a zoning commission, zoning board of appeals, planning commission, or wetlands agency, for its rejection of a proposal that includes a stated minimum number of affordable housing units, must reflect vital public health and safety concerns that substantially outweigh the need for affordable housing, and moreover, the vital health and safety reasons that are given by the agency are supported by the evidence in the record, of the agency's review of the application.
 Present law, this would change present law. This has been characterized as a shift of burden of proof and to a large extent that's true. Under present law, the Connecticut courts do not require agencies that I just named, to state the reasons for their rejection of an application. The statute requires them to state the reasons but the courts do not enforce the requirement.
 And even if the agency does state its reasons for rejection an application, there is no requirement that those, that the reasons be supported by the evidence, rather the burden of proof is on the applicant to show that the commission was wrong.
 In effect, the municipal agency's decisions are presumed correct unless shown otherwise, even if the agency gives no reasons for its conclusion. It's that problem that we are trying to address.
Joint Standing Committee Hearings, Planning Development, February 23, 1989, Part I, p. 253. CT Page 3133
The burden shifting scheme in this present statute underscores the need for the agency to cite its reasons. It will be extremely difficult for a reviewing court to search a record and decide whether the public interest of health, safety and other appropriate matters cannot be protected by reasonable changes to the proposed development. That decision belongs to the agency. It is thus fair to say that an agency that denies an application and does not cite the reasons for its decision will clearly be putting its decision in great jeopardy. This court is not departing from recent decisions instructing the trial court to search the record, Stankewicz v. Zoning Board of Appeals, 15 Conn. App. 729, 732, 546 A.2d 919 (1988), but simply admonishing agencies that the burden is no longer on the applicant.
5.
It must also be noted that where there is a requirement to state reasons, the reasons must be collective reasons of the Commission and not simply the individual views of each member. Protect Hamden/North Haven from Excessive Traffic Pollution, Inc. v. Planning Zoning Commission, 220 Conn. 527,544-545, ___ A.2d ___ (1991); Welch v. Zoning Board of Appeals,158 Conn. 208, 214, 257 A.2d 795 (1969). The necessity for this rule is obvious and, in terms of appeals under the Act, even more important as applicants have the opportunity under section 8-30g(d) to file an amended application "responding to some or all the objections or restrictions articulated by the commission." In the present case, the Commission did not comply with this rule. At first glance, it appears that the Commission did indeed vote to deny and fully state reasons. Return Item 14, the minutes of the December 19, 1990 decision-making meeting, in fact states, "upon motion . . . it was voted that the application is hereby denied for the following reasons. . . ." Nineteen reasons are listed. Return Item 16, the transmittal letter reflects the same procedure. The problem, however, is that the transcript of the December 19, 1990 meeting (Return Item 13) reveals just the opposite. The nineteen reasons were not reasons of the whole Commission. The actual transcript show that only a vote was taken — without the Commission providing reasons. Indeed, Commissioner Carron commented on the fact that certain statements "only represent my views as expressed not necessarily the views of the other commissioners who have simply said denial in total." (Return Item 13, p. 19).[17]
Commissioner Neri responded to a request to discuss collective reasons by stating "[t]here's nothing to discuss. We made our vote and that's the end of it." (Return Item 13, p. 20).[18]
Plaintiff commented on this inconsistency in its brief at page 15 and during the trial this issue was discussed again. While the plaintiff did not believe the failure to state reasons is CT Page 3134 determinative of this appeal, this court again adds that the failure to supply stated collective reasons undermines the defendant's position.
6.
 a.
Before commenting on the specific reasons, it is worth returning to Huntington, supra. In that case, the court utilized a test, adopted by the Third Circuit in Resident Advisory Board v. Rizzo, 564 F.2d 126 (3d Cir. 1977), cert. denied 435 U.S. 908
(1978), in which it held that to avoid liability (under Title VIII), "the defendant must prove that its actions furthered in theory and practice, a legitimate bona fide governmental interest and that no alternative would service the interest with less discriminatory effect." Id. 148-149. The court noted that in a zoning case, "a town's preference to maintain a particular zoning category for particular sections of the community is normally based on a variety of circumstances." Id. 936. That complexity does not relieve a court of weighing the town justifications against the adverse effects suffered by the plaintiffs. Id. 937. Having found that the plaintiffs had made a prima facie case; namely, that the refusal to rezone created a discriminatory effect, the court examined the town's defense.
As noted, the Blue Ribbon Commission was cognizant of the Huntington case when it prepared its report.[19] The Huntington formulation can certainly be seen in the burden switching mechanism in section 8-30g(c). Subsection (c)(1) requires that the decision and cited reasons be supported by sufficient evidence and subsection (c)(2) requires the decision be necessary to support substantial public interests in health, safety and other matters the commission can legally consider. This is similar to part one of the Huntington-Rizzo test: whether the reasons are bona fide and legitimate. Subsection (c)(3) requires the public interest to clearly outweigh the need for affordable housing, and subsection (c)(4) requires the commission to prove that the public interest cannot be protected by reasonable changes to the proposal. These subsections are akin to part two of the federal test, namely: whether any less discriminatory alternative can serve those ends. The Huntington court also noted that the second test could be divided into "plan specific" justifications and "site specific" justifications. "Plan specific" problems could presumably be resolved by less discriminatory alternatives of design modifications (in our case, subsection (c)(4), reasonable changes). "Site specific" justifications would be subject to the part two analysis and reviewed to determine whether they were bona fide and legitimate (i.e., subsection (c)(2) and (c)(3)). The Huntington court then CT Page 3135 added that:
 [t]he inquiry is whether the proffered justification is of substantial concern such that it would justify a reasonable official in making this determination. Of course, a concern may be non-frivolous, but may not be sufficient because it is not reflected in the record. Id. 939.
 b.
With this background, we now turn to the nineteen "reasons." Again, they are not collective reasons, rather they are the comments of certain commissioners. Many contain subparts and many are repetitive. Therefore, they will be reviewed together.
1.
Reasons 1, 2, 14, 16, 17, 18, 19 are all somewhat similar as they suggest that the application violates the town's zoning regulations (comprehensive plan) and its plan of development (master plan).[20]
They are:
1. A need for 480 condos was not demonstrated. It would only benefit the applicant at the expense of impeding the implementation of the Master Plan.
2. It would be detrimental to the welfare of the Town by eliminating industrial acreage which, in addition to taxes, provides increased employment opportunities, and affords existing opportunities to locate in Trumbull for industrial use.
14. The Master Plan shows population figures from 1970 to 1980, and the same increase shown in these figures would be realized in one fell swoop by this application; this would result in a 5% increase in the population of Trumbull. It would not be good planning practice to approve something of this magnitude without further study and direction as to whether this would be warranted.
16. The current zoning map shows basically two industrial areas in town, and this amendment would encompass all of the vacant industrial land in the southern part of town. The industrial property to the north has been largely developed. This proposal comprises about 75% of all industrially zoned land, and would eliminate most of the existing vacant industrial land. CT Page 3136
17. Trumbull is largely a residential community, commercial land is mostly developed, and it would be irresponsible to change most of the existing vacant industrial zones to residential uses solely because an applicant chooses to put rental units on this property.
18. In order to have a good economic base you have to have different types of land uses, and if the Commission approved this amendment, they would not be carrying out their function which is to create a properly planned Town which has all types of uses in it. The proposed regulation should include all types of zones with a different density in each zone.
19. If the proposal did not also include possible development of the adjacent industrial piece it would constitute spot zoning. It was designed solely for a particular contract purchaser, the applicant, and would benefit only the applicant; the Commission should not pass regulations to benefit one single entity.
First, the court notes, as did the plaintiff, that nowhere in this application did the applicant refer to "condos." The applicant has proposed to construct apartments. Additionally, the plaintiff is not required to demonstrate a need for these units. The legislature has decided that issue. If need is to be demonstrated, it is to be done by the Commission under subsection c(3) in which it must prove that certain public interests outweigh the need for affordable housing.
Second, providing affordable housing does not just benefit an applicant, it benefits a town, a region, a state. "Zoning changes affording special treatment to encourage the construction of multifamily residences in cities with housing shortages promote the public welfare and do not constitute spot zoning." Board of Appeals of Hanover v. Housing Appeals Com., supra, 411.
While the proposed change of zone is in conflict with the last revision to the master plan, it is not in conflict with the master plan's stated goals to provide more affordable housing. (Return Item 18, pp. 4-5). The faster plan is, of course, only advisory to the zoning commission and does not bind it. Lathrop v. Planning and Zoning Commission, 164 Conn. 215, 223,319 A.2d 376 (1973); Sheridan v. Planning Board, supra, 9. Still, this court believes its importance to a community cannot be ignored. A zoning commission's reliance on the master plan for its action has thus been approved. Raybestos-Manhattan, Inc. v. Planning Zoning Commission, 186 Conn. 466, 475, 442 A.2d 65 (1982); Mott's Realty Corporation v. Town Plan Zoning Commission, 152 Conn. 535,538, 209 A.2d 179 (1965). Indeed, the legislature enacted CT Page 3137P.A. 91-398 effective October 1, 1991, which amended General Statutes 8-3a to require a combined planning and zoning commission to state on the record its findings on consistency of a proposed zoning regulation or boundaries or changes with the plan of development.
Both the plan of development and the present zoning regulations indicate this parcel is now zoned industrial. The above reasons all reflect a concern with losing land designated to assist the town in broadening its tax base. That is a legitimate concern and towns are certainly allowed to increase their business zones. See, for example, Clark v. Town Council,145 Conn. 476, 144 A.2d 327 (1958). At the same time, that authority is not without limitation. For instance, an amendment to a zoning ordinance which prohibited residential development in an industrial zone when the land was not needed then or in the near future for industrial development has been held invalid. Corthouts v. Newington, 140 Conn. 284, 99 A.2d 112 (1953).
Because of the number of similarities, it is appropriate to refer to the landmark case of Southern Burlington County NAACP v. Township of Mount Laurel, 336 A.2d 713 (N.J. 1975) appeal dismissed, 423 U.S. 808 (1975) at this point. The town of Mount Laurel, like Euclid, Ohio, and like Trumbull, was a suburb; just outside of Philadelphia. As noted in the decision, New Jersey was faced with a housing "crisis" — "with a desperate need for housing, especially of decent living accommodations economically suitable for low and moderate income families." Id. 716. The court noted the trial court's finding that the town had "acted affirmatively to control development and to attract a selective type of growth." Id. 723. The New Jersey Supreme Court noted that this policy was directed to keeping property taxes down because of the system's tax structure which imposed on local real estate the cost of municipal government and education. Id. 723.
It is important to note that Mount Laurel had, at the time of decision, 30% of its land, or over 4100 acres zoned industrial. The court found it unlikely that the full amount would be developed. Id. 730. The court also found that while industrial zones were lawful, that "considering the basic importance of the opportunity for appropriate housing for all classes of our citizenry, no municipality may exclude or limit categories of housing for that reason or purpose." Id. 731.
The court concluded that "every municipality must by its land use regulations presumptively make realistically possible an appropriate variety and choice of housing." Id. 731. "The amount of land removed from residential use by allocation to industrial and commercial purposes must be reasonably related CT Page 3138 to the present and future potential for such purposes . . . [s]uch municipalities must zone primarily for the living welfare of people and not for the benefit of the local tax rate." Id. 732.
Trumbull is not, at this stage, a developing community. According to the 1984 Plan of Development, 90% of its land has been developed with approximately 1520 acres remaining vacant. (Return Item 10f, p. 23).
 Trumbull is now in a leveling off stage, approaching full maturity. Household size and school enrollment are both declining (although school enrollment may increase in the 1990's). The current population of 33,700 is not expected to exceed 35,000, based on population trends and land availability. This total would probably increase to 36,000 if the proposed housing alternatives are implemented. Industrial and Commercial areas have been filled out to what may be their permanent limits, and there is still an abundance of both to meet the needs and demands of a fully matured Trumbull population. Trumbull is, in fact, fortunate to have two of three Regional Shopping Centers, serving beyond the Greater Bridgeport Planning Area. These two centers alone not only contribute handsomely to the tax base, but will provide approximately 1,300,000 square feet of shopping space when the next phase of the Westfield Shopping Center is completed. . . .
(Return Item 10f, Introduction).
The Plan of Development reveals that of the 452 acres zoned industrial, only 262 acres have been developed. Thus, "there is still enough vacant land within these limits to almost double the present industrial land uses." (Return Item 10f, p. 32). It does recommend that even though there is "a large amount of vacant land remaining", that "all existing areas should be expanded to their maximum extent consistent with good planning and town policies."
(Return Item 10f, p. 33).
One of these town policies is "seeking housing alternatives for various segments of the population." (Return Item 10f, p. 4). The recommendation to address that need included:
 1. Consider zoning for alternative housing development in 1/2 acre residential zones where CT Page 3139 sewer service is available. This could include:
 a. Single family units at densities of 4 units per acre, with each lot having frontage on Main St. or Route 127, on vacant parcels of 2 acres or more. Depth of the parcels will be determined in the regulations.
 b. Multi-family units at 4 units per acre of buildable land within or adjacent to B-C zones. It is recommended that a maximum of 200 units be approved town-wide.
2. Find additional locations for elderly housing units.
3. Consider zoning provisions for "accessory" apartments.
4. Support regional housing efforts.
(Return Item 10f, p. 4).
The report further states that constructing multi-family housing could be a "tax benefit to town" [sic]. (Return Item 10f, p. 22). At the same time, the Plan also states that:
 Trumbull's major housing problems continue to be the high cost of housing and the lack of alternatives to the single family home. This continues to present problems for moderate income families seeking home ownership, to younger persons seeking to remain in town on their own, and to elderly homeowners who wish to stay in town but not have the maintenance burdens of a large home. . . .
 For young adults and young families there is still a problem of housing cost. Housing will never be inexpensive in Trumbull, but alternative types of housing can make housing more affordable. The 1974 Plan of Development proposed the construction of multi-family housing on large parcels of land served by public sewers, and there are still some suitable locations. . . .
(Return Item 10f, p. 21).
This court has no doubt that if the present application involved a request to rezone this property for a traditional residential subdivision that the deference standard earlier described would certainly prevail. This court would not and CT Page 3140 could not substitute its discretion for the Trumbull commission. As noted by Justice Sutherland in Euclid, however, "the line of legitimacy varies with circumstances and conditions." Id.272 U.S. at 387. "A regulation that may have some beneficial effect will not, ipso facto, be considered valid and consonant with the general welfare but, rather, inquiry must also be directed toward whatever detrimental effects a particular regulation has." Builders Service, supra, 283. Thus, there are cases where "the public interest would so far outweigh the interest of the municipality that the municipality would not be allowed to stand in the way." Euclid, 272 U.S. at 390. See also, State v. Hillman, 110 Conn. 92, 100, 147 A. 294 (1929). Zoning regulations and zoning comprehensive plans that discriminate against economically disadvantaged citizens are contrary to the public welfare and not within the general purposes of General Statutes 8-2.[21] Builders Service, supra, 298; see also Britton v. Town of Chester, 595 A.2d 492 (N.H. 1991); Suffolk Interreligious Coalition on Housing v. Town of Brookhaven,575 N.Y.S.2d 548, 549 (1991); Mount Laurel, supra, 732; Board of Appeals of Hanover v. Housing Appeals Com, supra, 423. Zoning out multifamily housing has been held to be illegal. Berenson v. Town of New Castle, 341 N.E.2d 236, (N.Y. 1975); Appeal of Girsh, 263 A.2d 395 (Pa. 1970); but see Bradley v. Zoning Board of Appeals, 165 Conn. 389, 334 A.2d 914 (1973) (granting of variance to allow multifamily development in town with no multifamily housing held error since action not in harmony with the zoning plan). The record is clear that the State of Connecticut does not believe that Trumbull has sufficient affordable housing as only 1.8 percent of its housing stock (or 200 units) qualifies under the state definition. (Return Item 10b).
Returning to the statutory burden of proof of 8-30g(c), this court does not believe that the Commission, based on the evidence in the record (notwithstanding certain comments made by individual commissioners), has sustained its burden that the interests in developing this industrial land outweigh the need for affordable housing.
2.
The next set of reasons are related to traffic and fire safety concerns:
3. It would be detrimental to the safety and welfare of the Town by reason of the volume and intensity of the use concentrated in one area.
4. The Commission has no control or authority over street or highway improvements. The amendment proposed is CT Page 3141 dependent for its proper functioning on action by other agencies. There was no evidence that acknowledged or verified when and how road improvements to Old Town Road were to be made in order to handle the density of traffic in the area.
5. There is only one outlet onto Old Town Road; with the number of units proposed approximately 1,200 people entering and exiting through this one outlet is quite dangerous.
8. The proposed density of 16 units per acre is significantly greater than in any other area of Town and would have a negative impact on all services such as the volunteer fire department, EMS, police, and refuse disposal. Traffic would be increased substantially because of the 600 units proposed in one area.
10. The proposed height of the buildings is ten feet higher than currently permitted which could result in safety problems in the event of fire.
Under the Huntington test, these reasons would all be labeled "plan specific" (issues which can be resolved with reasonable design modifications), with the possible exception of reason five: one outlet onto Old Town Road. The plaintiff has argued that the Commission previously approved the office park with a higher traffic volume than the subject application. Traffic studies were prepared in both cases and reveal the following:
Office Park (Approved) Residential Use
A.M. PEAK Inbound 725 60 Outbound 75 260 Total: 800 320
P.M. PEAK Inbound 90 275 Outbound 680 130 Total: 770 405
TOTAL DAILY VOLUME Inbound 2060 1830 Outbound 2060 1830 Total: 4120 3660
(Office park figures from Return Item 13m, p. 11; residential use figures from Return Item 10a (10)). CT Page 3142
The record reflects that the traffic volume, in terms of trips per day and at peak hours is higher with the office park. Additionally, while there was concern about road improvements, the court notes that the office park required signal installations and road widening improvements on Old Town Road. (Return Items 13m, pp. 16-21; v, pp. 12-14). It also appears that the office park, as approved, had one outlet onto Old Town Road (reason 5) (Return Items 13m, p. 10; 13v, p. 5). These plan specific objections then do not seem to be particularly strong.
Legitimate concern was posed concerning how improvements would be made to Old Town Road. The office park approvals contained such requirements as supplying the "profile for Old Town Road showing existing condition," requiring "the construction plan for West Park Drive to comply with requirements of the Town Engineer" (Return Item 13t) and requiring permits from the State Traffic Commission (Return Item 13u). There were no specific drawings or profiles submitted by this applicant (Return Item 10, p. 28) but that is, in part, due to the nature of the administrative process. Indeed, Commission members did not want to discuss specific design. (Return Item 10, p. 17).[22]
The AHD regulation, as proposed, would have required site plan review and a site plan regulation was, of course, part of the applicant's proposal. That plan, at section IIIa(1), (2), (8) and section IV(a)(1)(2) would have necessitated the submission of that information. (Return Item 2). Indeed, Section IV states that "site plan may be modified and conditions put on approvals when deemed necessary to meet the following objectives: (a) safe, adequate and convenient vehicular and pedestrian traffic both within and without the site. . . .
Finally, a concern was raised over the height of the buildings — reason 10. This reason, like the traffic issues, is essentially plan specific. This court notes that the office park anticipated three and four-story buildings (Return Item 13v, p. 7).
3.
Reasons 6, 7, 11, and 15 are the next set of concerns:
They state:
6. Limiting sites to frontage on a limited access highway and to acreage greater than 30 acres but less than 40 acres does not provide affordable housing throughout the Town. CT Page 3143
7. The proposed amendment does not carry out the intent of the affordable housing statute since it does not provide housing to a great number of people. In addition, it would deteriorate the economy of neighboring Bridgeport since young professionals from that city would relocate to these units in Trumbull.
11. The proposal should be modified to extend the period of time from 20 years since a need will likely exist for affordable housing at the end of this time.
15. The number of affordable units being offered in this proposal will not enable the Town to ever attain the goal of 10% affordable units. The size of the Town would have to be doubled to provide the amount of affordable housing units required by the State. The Commission would have to approve 17 projects of similar size to reach the affordable guideline of 10%; there is not sufficient land to accomplish this.
These comments focus on debatable issues of P.A. 89-311. The statute indeed has a 20-year limitation and will require significant building for towns, such as Trumbull, to meet the statutory 10% goal. These are issues for the legislature, however, and not for this court. Leland v. Chawla, 39 Conn. Sup. 8,12 (1983).
To suggest that this project should be denied because the proposed AHD limits the zone to certain areas would result in no affordable housing at all. The town is not powerless, of course. It has the ability to review its zoning regulations to accommodate more types of housing.[23]
4.
Reason 9 concerns education:
9. The additional school children generated by the percentage of two and three bedroom units (because of the total number of units proposed) will have a negative impact on the educational system; additional staff will be needed and possibly additional schools.
The testimony in the record, at least that given by Professor David Listokin of the Center for Urban Policy at Rutgers University, does not support this conclusion. His conclusion was that the project might generate approximately 50 additional pupils. (Return Items 10, pp. 23-27; 10a(9)). It is true that "an administrative agency is not required to believe any witness, even an expert," Manor Development Corporation v. Conservation Commission, 180 Conn. 692, 697, CT Page 3144433 A.2d 999 (1980) and that in matters readily within their competence, commission members may rely on their personal knowledge. Welch v. Zoning Board, supra, 214. However, there are two problems in this case. First, as indicated, this is not a reason of the Commission as a whole; rather, it is a reason of one member. Second, this case differs from traditional zoning appeals as the agency has the burden of proof. Thus, the requirements of fairness, as set forth in Feinson v. Conservation Commission, 180 Conn. 421, 428, 429 A.2d 910 (1980) must be heeded: "[i]f the administrative agency chooses to rely on its own judgment, it has a responsibility to reveal publicly its special knowledge and experience to give notice of the material facts that are critical to its decision, so that a person adversely affected thereby has an opportunity for rebuttal. . . ." No such special knowledge or information has been revealed on this record.
Finally, as noted by the plaintiff, reason 9 is based primarily on fiscal concerns. It has long been clear that zoning policy may not be based on fiscal considerations such as whether a particular residential development will result in added costs to the town. Beach v. Planning Zoning Commission, 141 Conn. 79,84, 103 A.2d 814 (1954). "Fiscal zoning per se is irrelevant to the statutory purposes of zoning." Oakwood at Madison, Inc. v. Township of Madison, 283 A.2d 353, 357 (1971). See also, Mount Laurel, supra, 732; Taylor v. County of Peoria,333 N.E.2d 726, 730 (Ill. 1975); Lakeland Bluff Inc. v. County of Will,252 N.E.2d 765, 770 (Ill. 1969).
5.
Reason twelve states:
 12. No one supported this amendment or spoke in favor of it who would likely benefit, namely Town employees, young couples, and senior citizens.
It is a fundamental principle that "where a zoning authority has stated the reasons for its action, a reviewing court may only determine if the reasons given are supported by the record and are pertinent to the decision." Spectrum of Connecticut v. Planning Zoning Commission, 13 Conn. App. 159,163-64, 535 A.2d 382, cert. denied, 207 Conn. 804 (1988). Assuming Arguendo, that no one other than the applicant testified in favor of the regulation, that fact is not a pertinent consideration for the Commission.
"Zoning is not to be based upon a plebiscite of the neighbors. Their wishes are to be considered but the final CT Page 3145 ruling is to be governed by the basic consideration of the benefit or harm involved to the community at large." Arkenberg v. City of Topeka, 421 P.2d 213, 219 (1966). Or as stated by another court: "in exercising their zoning powers, the local authorities must act for the benefit of the community as a whole following a calm and deliberate consideration of the alternatives, and not because of the whims of either an articulate minority or even majority of the community." Udell v. Haas, 288 N.Y.S.2d 888, 893 (1968).
Thus, "while it is recognized that public-spirited citizens volunteer to perform their civic duties in serving on boards such as those involving zoning, the responsibility accompanying these positions includes the duty to act in accordance with the law, to insure the preservation of the rights of those affected." Carini v. Zoning Board of Appeals, 164 Conn. 169, 172,319 A.2d 390 (1972). Reason twelve is not a proper concern upon which to approve or deny a zoning application.
6.
The last reason is thirteen:
 13. If the proposed amendment were modified, which is site specific for two contiguous places, it could change the areas that could comply and would require another public hearing; it would be inappropriate to do any major modifications without public input.
This concern states a basic rule of administrative law; namely, a substantial modification to a previously noticed application would require new public notice and a subsequent public hearing. Having said this, however, as long as the application has not been substantially modified, it is not a reason to support a denial.
7.
Had this been a traditional zoning appeal with standard rules of review, the denial would be upheld since it would find support in the record. Goldberg v. Zoning Commission, supra. Again, this is not a traditional zoning appeal and the Commission has not met its new burden of proof. The decision and the concerns are not supported by sufficient evidence. The decision and the concerns do not clearly outweigh the need for affordable housing. (Return Item 10b). The Commission has not shown that the concerns cannot be protected by reasonable changes. CT Page 3146
 III.
CONCLUSION
Section 8-30g(c) concludes by stating that "if the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, or remand the decision from which the appeal was taken in a manner consistent with the evidence in the record before it." Traditional appeals have been governed by the rule set forth in Thorne v. Zoning Commission, 178 Conn. 198, 206,423 A.2d 861 (1979) which states that when "as a matter of law there was but a single conclusion which the zoning authority could reasonably reach, the court may direct the administrative agency to do or refrain from doing what the conclusion legally requires. . . . In the absence of such circumstances however, the court upon concluding that the action . . . was illegal, arbitrary or in abuse of its discretion should go no further than to sustain the appeal. . . . For the court to go further and direct what action should be taken by the zoning authority would be an impermissible judicial usurpation of the administrative functions of the authority." (Citations omitted).
Section 8-30g(c) allows the court more options than those allowed under the Thorne rule. The plaintiff argues that the Act requires this court to direct approval of the application if the Commission does not sustain its burden of proof. The Commission, on the other hand, maintains under the Thorne reasoning that this court should not become, in effect, the Trumbull Planning and Zoning Commission. While certain fact situations may indeed require "judicial usurpation," this court believes that only judicial supervision is required at this time.[24]
First, the legislature provided the trial court with a number of choices after reviewing the record. Section 8-30g(c) does not say that if the commission does not sustain its burden a court must sustain the appeal and direct the commission to approve the application. Rather, there are a number of options including, to wholly or partly revise, modify, remand or revise based on the evidence in the record. Second, this statute and the burden of proof requirement is new — it changes a longstanding practice of administrative boards in this state. We have over the years noted that these boards are composed of well-intentioned lay volunteers giving innumerable hours and evenings to their communities. Almost forty years ago, our Supreme Court, in discussing a zoning commission, stated:
 It must be borne in mind, however, that we are dealing with a group of laymen who may not always express themselves with the nicety of a CT Page 3147 Philadelphia lawyer. Courts must be scrupulous not to hamper the legitimate activities of civic administrative boards by indulging in a microscopic search for technical infirmities in their actions.
Couch v. Zoning Commission, supra, 358. In reviewing this record and the reasons for the denial, this court must be mindful of this fact.
Additionally, Connecticut land use boards have never been required to suggest modifications or redesign a deficient land use application. Their job has been to review a specific application to determine whether it meets the applicable regulations. Huck v. Inland Wetlands Watercourses Agency, supra, 553; Shorehaven Golf Club Inc. v. Water Resources Commission, 146 Conn. 619, 625, 153 A.2d 444 (1959). If an application does not pass muster, it fails; the commission has never had a duty to alter it and schedule a rehearing for that purpose. Huck, supra. The legislature authorized the variety of judicial responses knowing that each application is indeed different and thus might require a different remedy. At least one legislator acknowledged that applications can be blatantly flawed or lacking information seeking to "shoe horn" development (i.e., being overly ambitious in the density aspect of a proposal). "They will come in with overinflated figures for the number of units that they would like to get in a quarter acre, half acre, acre or, you know, depending on the size of the parcel . . . ." Comments of Representative Krawiecki, 32 House Procs., Part 30, May 30, 1989, pp. 10646-10651; 10657-10661. At this stage of these proceedings, it is the board that is best able to make sound determinations as to the appropriateness of a legislative regulation and zone change proposal.
As previously discussed, the individual members of the Commission were troubled with certain aspects of the proposed regulations. Some of these concerns are legitimate considerations for those who exercise zoning powers. Others are not. This court has discussed those 19 "reasons." Assuming that there may have been some confusion about new obligations under this Act and that the Commission may not have been as articulate as a Philadelphia lawyer, let alone a Connecticut lawyer, in explaining the reasons for denial, this court believes a remand to the Commission for further consideration is warranted. The Commission might as a body review the density issue. Perhaps 16 units to an acre is appropriate, or necessary; perhaps it is not. The Commission could decide to receive another presentation on all issues, including road improvements, traffic safety, and fire safety. Similarly in this legislative capacity, the Commission might decide to truly review the impact, whether positive or negative, CT Page 3148 of utilizing the subject parcel for housing rather than industry.
The Commission's charge is to review the application and articulate its decision under the standards set forth in Section 8-30g(c)[25] This court believes that such an opportunity is warranted and appropriate.
Returning to Mount Laurel, this court adopts the sentiments of Justice Hull, who likewise remanded that case to the municipality.
 Courts do not build housing nor do municipalities. That function is performed by private builders, various kinds of associations, or, for public housing, by special agencies created for that purpose at various levels of government. The municipal function is initially to provide the opportunity through appropriate land use regulations and we have spelled out what Mount Laurel must do in that regard. It is not appropriate at this time, particularly in view of the advanced view of zoning law as applied to housing laid down by this opinion, to deal with the matter of the further extent of judicial power in the field or to exercise any such power. . . . The municipality should first have full opportunity to itself act without judicial supervision.
Mount Laurel, supra.
To conclude, it is the decision of this court that the plaintiff's appeal is sustained to the extent the Commission has not met its burden of proof set forth in Section 8-30g(c). Nevertheless, site specific relief, Huntington, supra, 942, or a builder's remedy, Britton v. Town of Chester,595 A.2d 492, 497 (N.H. 1991); Hills Development Co. v. Bernards TP., Somerset County, 510 A.2d 621, 643, 103 N.J. 1 (N.J. 1986); Mount Laurel II, 456 A.2d 390, 452 (N.J. 1983), is not appropriate at this time. This case is, therefore, remanded to the Commission for further action, as it deems warranted, not inconsistent with this decision. The Commission shall have three months, or such time as is required upon a showing to this court, to take such action.
BERGER, J.
APPENDIX ONE
AFFORDABLE HOUSING LAND USE APPEALS
Sec. 8-30g. Affordable housing land use appeals procedure. (a) As used in this section:
(1) "Affordable housing development" means a proposed housing development (A) which is assisted housing or (B) in which not less than twenty per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income, for at least twenty years after the initial occupation of the proposed development; (2) "affordable housing application" means any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing; (3) "assisted housing" means housing which is receiving, or will receive, financial assistance under any governmental program for CT Page 3153 the construction or substantial rehabilitation of low and moderate income housing, and any housing occupied by persons receiving rental assistance under chapter 138a or Section 1437f of Title 42 of the United States Code; (4) "commission" means a zoning commission, planning commission, planning and zoning commission, zoning board of appeals or municipal agency exercising zoning or planning authority; and (5) "municipality" means any town, city or borough, whether consolidated or unconsolidated.
(b) Any person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, specified in subparagraph (B) of subdivision (1) of subsection (a) of this section, contained in the affordable housing development, may appeal such decision pursuant to the procedures of this section. Such appeal shall be filed within the time period for filing appeals as set forth in sections 8-8,8-9, 8-28, 8-30, or 8-30a, as applicable, and shall be made returnable to the superior court for the judicial district of Hartford-New Britain*. Affordable housing appeals shall be heard by a judge assigned by the chief court administrator to hear such appeals. To the extent practicable, efforts shall be made to assign such cases to a small number of judges so that a consistent body of expertise can be developed. Appeals taken pursuant to this subsection shall be privileged cases to be heard by the court as soon after the return day as is practicable. Except as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of said sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable.
(c) Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (2) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (3) such public interests clearly outweigh the need for affordable housing; and (4) such public interests cannot be protected by reasonable changes to the affordable housing development. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it.
(d) Following a decision by a commission to reject an affordable housing application or to approve an application with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, the applicant may, within the period for filing an appeal of such decision, submit to the commission a proposed CT Page 3154 modification of its proposal responding to some or all of the objections or restrictions articulated by the commission, which shall be treated as an amendment to the original proposal. The filing of such a proposed modification shall stay the period for filing an appeal from the decision of the commission an the original application. The commission may hold a public hearing and shall render a decision on the proposed modification within forty-five days of me receipt of such proposed modification. The commission shall issue notice of its decision as provided by law. Failure of the commission to render a decision within said forty-five days shall constitute a rejection of the proposed modification. Within the time period for filing an appeal on the proposed modification as set forth in sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable, the applicant may appeal the commission's decision on the original application and the proposed modification in the manner set forth in this section. Nothing in this subsection shall be construed to limit the right of an applicant to appeal the original decision of the commission in the manner set forth in this section without submitting a proposed modification or to limit the issues which may be raised in any appeal under this section.
(e) Nothing in this section shall be deemed to preclude any right of appeal under the provisions of sections 8-8, 8-9, 8-28, 8-30, or 8-30a.
(f) Notwithstanding the provisions of subsections (a) to (e), inclusive, of this section, the affordable housing appeals procedure established under this section shall not be available if the real property which is the subject of the application is located in a municipality in which at least ten per cent of all dwelling units in the municipality are (1) assisted housing or (2) currently financed by Connecticut Housing Finance Authority mortgages or (3) subject to deeds containing covenants or restrictions which require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income. The commissioner of housing shall, pursuant to regulations adopted under the provisions of chapter 54, promulgate a list of municipalities which satisfy the criteria contained in this subsection and shall update such list not less than annually.
(g) Notwithstanding the provisions of subsections (a) to (e), inclusive, of this section, the affordable housing appeals procedure shall not be applicable to an affordable housing application filed with a commission during the one-year period after a certification of affordable housing project completion issued by the commissioner of housing is published in the Connecticut Law Journal. The commissioner of housing shall issue a certification of affordable housing project completion for the purposes of this subsection upon finding that (1) the municipality has completed an initial eligible housing development or developments pursuant to section 8-336f or sections8-386 and 8-387 which create affordable dwelling units equal to at least one per cent of all dwelling units in the municipality and CT Page 3155 (2) the municipality is actively involved in the Connecticut housing partnership program or the regional fair housing compact pilot program under said sections. The affordable housing appeals procedure shall be applicable to affordable housing applications filed with a commission after such one-year period, except as otherwise provided in subsection (f) of this section.